IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER ROBINSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 13 C 4049 |
| | ) | |
| v. | ) | Judge Joan H. Lefkow |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Christopher Robinson filed this suit against the City of Chicago asserting that the City's revocation of his conditional offer of employment as a Fire Department paramedic was discriminatory in violation of the Americans with Disabilities Act (the ADA), 42 U.S.C. §§ 12101 *et seq.*[1] The City seeks summary judgment on the bases that Robinson cannot establish that he is a qualified individual with a disability and cannot rebut the City's evidence that he was rejected from employment for reasons that are job-related and consistent with business necessity.[2] For the reasons stated below, the motion is denied.

---

[1] The court has subject matter jurisdiction under 29 U.S.C. § 12133, incorporating remedies under Title VII and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.* Venue is proper in this district.

[2] The court applies the established legal standards for ruling on a motion for summary judgment. *See Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007); *see also Wojtanek* v. *Dist. Lodge No. 8*, No. 8 C 7074, 2011 WL 248495, *2 (N.D. Ill. Jan. 25, 2011) (Lefkow, J., setting out summary judgment standards).

# FACTS[3]

In 2012,[4] the duties of a Chicago Fire Department (CFD) paramedic included responding to Emergency Medical Services calls of any type, bringing medical equipment to a patient's side, transporting a patient from the scene of an incident to an ambulance, delivering emergency medical treatment, and preparing and transporting patients to a hospital. Paramedics worked in a stressful and physically demanding environment and needed to be mentally and physically fit.

CFD employed two experienced occupational health physicians in its Medical Division, Dr. Hugh Russell and Dr. Isaac Morcos. These physicians reviewed the medical records of CFD applicants to determine whether they were medically qualified to work at CFD. Elise Horton-Newkirk was an occupational health nurse in the Medical Division who, among other duties, sent follow-up letters to applicants along with relevant test results from the applicants' medical file.

After successfully meeting preliminary qualifications for the paramedic job, all applicants were required to submit to a physical abilities test (PAT) administered by a third-party contractor. The PAT included a step test, rotary test, and lift test, tests that corresponded to duties of the paramedic position such as climbing stairs and carrying patients. After passing the PAT, an applicant could receive an offer of employment, conditioned on passing a medical examination (and certain other requirements not relevant here).

---

[3] Unless otherwise noted, the facts in this section are taken from the parties' Local Rule 56.1 statements and are construed in the light most favorable to the plaintiff. The court will address many but not all of the factual allegations in the parties' submissions, as the court is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage." *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (citation omitted). In accordance with its regular practice, the court has considered the parties' objections to the statements of fact and includes in this background only those portions of the statements and responses that are appropriately supported and relevant to the resolution of this motion. Facts that are not controverted as provided in Local Rule 56.1 are deemed admitted. Facts that are based on evidence that would be inadmissible at trial are disregarded.

[4] Relevant events occurred during the year 2012 unless otherwise indicated.

The medical examination was identical for each applicant and included a complete physical examination, a complete vision test, a tonometry test (which measures intraocular pressure in the eye), a pulmonary function test (PFT), a 12-lead electrocardiogram, and a nine-minute-thirty-second treadmill stress test. The exam was performed by a third-party contractor, which forwarded the results to CFD to be reviewed by the occupational health physicians. The applicant was required to sign a consent form acknowledging that results obtained would assist in evaluating the applicant's ability to engage in the physical activities necessary for the position.

At the time Robinson took the medical exam, both firefighters and paramedic applicants were required to meet the same standards. The stress test was given to assess cardiovascular illness such as ischemia or coronary artery disease and to measure oxygen uptake, heart rate, and blood pressure under strenuous situations. The test also measured "metabolic equivalent of task" (METs), which indicates the amount of work the applicant's body can do. An applicant was expected to reach 10.0 METs to be able to perform the job of paramedic or firefighter.[5] High body mass index (BMI) or obesity did not automatically disqualify an applicant.[6]

The test results were used by the CFD physicians to evaluate whether an applicant could safely and effectively perform all of the duties of the paramedic position.[7] A reviewing physician

---

[5] See Pl. Stmt. of Facts ¶ 10 (dkt. 93). Chief Ignacio testified the standard was 10.9 METS, but Dr. Russell testified to 10.0. The lower number is accepted for purposes of the motion. According to Dr. Russell, until 2009 or 2010, there had been no METS standard for paramedic candidates, but at or about that time CFD began to cross-train fire fighters and paramedics to perform both jobs, so the 10 METS standard was also applied to paramedic candidates. *See* Russell Dep. 27–28 (dkt. 93-11). Dr. Russell also testified that an evaluation of paramedic functions at that time revealed that the same level of activity was needed for paramedics as for firefighters. *Id.* at 28–35.

[6] Dr. Russell testified that BMI was not a criterion because "some individuals, because of their stature, who may have a high BMI, . . . can perform [the job's] functions well." Russell Dep. 39:9–11 (dkt. 93-11).

[7] Robinson denies this statement of fact on the basis that it is supported by Dr. Russell's testimony but Dr. Russell did not review his test results and could not determine whether Robinson could

would determine whether additional follow-up, such as referral to a general physician or specialist was needed.

An applicant who failed the medical exam was told to see a personal physician and to have certain tests repeated and to send reports back to CFD. If the applicant received medical clearance from a physician, that information would be reevaluated by a CFD physician, and the applicant's medical status would be approved if the ongoing problem was under treatment or management. An applicant who did not pass the stress test was allowed to retake the test. Ultimately, the CFD physician would inform CFD's Human Resources Department whether the applicant was medically qualified for the position.

An applicant who passed the physical examination (and met the other requirements) became a paramedic candidate and began training at the Fire Academy for a three-month period. To graduate from the Academy, a candidate had to pass a step test, which required stepping upon and down from a nine-inch-high platform, for at least two minutes at 112 steps per minute, while holding a twenty-five pound dumbbell in each hand. A candidate, working with a partner, was also required within eight minutes to carry a 250-pound manikin up three flights of stairs on a stair chair, return down the stairs carrying the manikin, and handle the manikin according to a prescribed protocol until it was loaded into an ambulance. Both tests were very strenuous in terms of cardiovascular endurance, muscular strength and endurance, agility, and flexibility. A candidate had to complete all the requirements of the Fire Academy before being allowed to respond to live emergency calls in the field.

---

safely and effectively perform the duties of the position. Dr. Russell is qualified to testify as to the practice of his department at the time of Robinson's examination in 2012, although he cannot testify to what was actually done in Robinson's case.

Robinson applied for the paramedic position in 2007. He passed the PAT administered in April 2010. At that time he weighed approximately 365 pounds. In 2012, he received a conditional offer and was directed to undergo a medical examination, which he did in May, 2012. At that time, he weighed 401 pounds.

Before the medical exam was administered, Robinson signed an "informed consent" form, permitting the CFD to use the results in evaluating his ability to engage in the physical activities necessary for the position of paramedic. He also agreed that the examiner could stop the test if potential medical problems were observed.

Dr. Morcos evaluated the results of the medical examination and made progress notes in Robinson's medical file. After that evaluation, CFD sent Robinson a letter requesting follow-up information from his personal physician, an ophthalmologist, and a pulmonologist. The letter advised Robinson that he would need to repeat the PFT and submit "the results of the repeated test and medical clearance." The letter further advised Robinson to see an ophthalmologist due to "increase[d] intraocular pressure in the right eye and distance vision [in the] left eye," to repeat the tonometry test and eye exam, and to obtain medical clearance from the ophthalmologist. The letter also advised Robinson to call Nurse Horton-Newkirk if he had questions. Robinson called and asked if he had to see his personal physician as well as the pulmonologist and an ophthalmologist as stated in the letter. Horton-Newkirk responded that he only needed to see a pulmonologist and an ophthalmologist.[8]

Robinson provided CFD with reports from an ophthalmologist and a pulmonologist. The ophthalmologist reported that he had given Robinson a prescription that could correct his vision

---

[8] Dr. Russell also testified that a personal physician's report was not always required if the specialists' reports resolved the issues. *See* Russell Dep. 53:10–20 (dkt. 93-11).

to 20/30 in both eyes and he found no other "significant positive ocular findings." The pulmonologist performed a repeat PFT and reported no obvious obstructive or restrictive defect. She advised the patient to continue with a diet/exercise regimen for weight loss but reported that "from a pulmonary perspective, [Robinson could] proceed with training."[9] Robinson did not provide a report from his personal physician. After receiving the reports from the specialists, CFD did not initiate a direction for Robinson to retake the medical exam.

In August 2012, Robinson received a letter from CFD stating that, based on the results of his medical examination, he did not qualify to advance to the next stage of the application process.

From 2007 to the present Robinson has been employed as a paramedic by "Bud's Ambulance," a medical transport service located in Dolton, Illinois. In that job, he must carry equipment that weighs about 35 pounds as well as a stair chair weighing more than 20 pounds. When climbing stairs, Robinson and his partner share carrying the equipment. Robinson has never had to carry all of it upstairs by himself. He has had to climb as many as seven flights of stairs. He typically works a twelve-hour shift for about 72 hours a week and typically responds to six or seven calls per shift.

## ANALYSIS

The court set out the governing legal principles of the ADA in its ruling on the City's motion for judgment on the pleadings (dkt. 30) and will repeat them here only as needed for clarity. As applicable here, a person is "disabled" under the ADA if he has or is regarded as having an impairment that substantially limits one or more of the person's major life activities (including, for example, seeing, lifting, breathing, and working). *See* 42 U.S.C. § 12102(1)(a)

---

[9] By this, the pulmonologist was only indicating that Robinson was not found to have any lung disease or obstructive or restrictive defects. She was not indicating his fitness for the paramedic position.

and (2)(A). A person may establish that he is regarded as having an impairment if he can show that he "has been subjected to an action prohibited under [the ADA, which includes refusal to hire,] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A); *see also* 29 C.F.R. § 1630.2(l).

Robinson must prove (1) that the CFD regarded him as having a disability as defined by the ADA, (2) that at the time of his application for employment he was qualified to perform the essential functions of the job of paramedic, and (3) that he was not hired because he was regarded as having a disability. *See Gogos* v. *AMS Mech. Sys., Inc.*, 737 F.3d 1170, 1172 (7th Cir. 2013). Under Robinson's theory that CFD "regarded" him as having a disability, the first and third prongs lay out essentially the same inquiry. The City contends that the undisputed facts demonstrate that Robinson was not a qualified individual and was not regarded as having a disability and, even if both facts were established, its defense of business necessity defeats Robinson's claim.

Robinson has demonstrated a genuine issue of material fact as to whether CFD regarded him as having a disability as defined by the ADA. The evidence shows that after the medical exam, the CFD physician was concerned about Robinson's failure to finish the stress test, his pulmonary function, and his visual acuity. Robinson met the stress test's METs requirement, and there is no evidence that the test revealed that he had cardiovascular illness. He produced the requested follow-up reports and was cleared by the specialist physicians as not having lung disease or defects and having correctable vision to the degree required. Unlike other applicants, who were allowed to re-take the stress test if they failed the first time, Robinson was not permitted to retake the stress test. Because the City has no witness who can testify as to why the

follow up reports were insufficient or why the stress test was not re-administered, a reasonable jury could infer that the City declined to hire him because it regarded him as having a disability, even though he might have passed the stress test had he been allowed to retake it as other applicants were allowed to do. For example, a jury could infer that Robinson was not hired because of his obesity, even if he could perform the tasks required of him. This is by no means the only inference that could be drawn from the evidence, but the court cannot state as a matter of law that no reasonable jury could find that revocation of the conditional offer was discriminatory.

To the extent the City relies on Robinson's failure to submit a report from his personal physician, it points to no admissible evidence indicating that this was the reason for its decision. Even if there were such evidence, Robinson has submitted evidence that he was told by a person with authority to speak that he did not have to do that if he submitted the specialists' reports.

Robinson has demonstrated a genuine issue of material fact as to whether he was qualified to perform the duties of a paramedic. Under the ADA, a "qualified individual" is someone "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A "qualified individual" must be able to satisfy the "requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires . . . ." 29 C.F.R. § 1630.2(m); *see also Budde* v. *Kane Cnty. Forest Preserve*, 597 F.3d 860, 862 (7th Cir. 2010). Robinson passed the PAT, which permits the inference that he demonstrated at least threshold physical ability to perform the physical demands of the paramedic job. Furthermore, he was then working for an ambulance service that requires similar (though less strenuous) physical abilities. Although there is ample evidence in the record that the physical demands of the CFD

job are more strenuous than those required by the PAT and the ambulance service, the City has no witness who can testify that these additional qualifications were applied to Robinson in making its decision not to hire him. The other evidence, even if relevant, is not conclusive in light of evidence to the contrary.

Finally, the City asserts that its decision was based on business necessity. The City points to no evidence that, at the time this decision was made, the CFD relied on any factor other than the results of the medical exam for its decision to deny employment to Robinson. Because Robinson produced the requested follow-up reports and CFD did not allow him to re-take the stress test, the court cannot state as a matter of law that no reasonable jury could infer that the City's decision not to hire him was based on impermissible discrimination, rather than permissible business necessity.

For all of these reasons the motion for summary judgment must be denied.

## ORDER

The revised motion of the City of Chicago for summary judgment (dkt. 94) is denied. The motion of the City of Chicago for summary judgment (dkt. 78) is moot. This case will be called on May 24, 2017 at 9:30 a.m., for a status hearing to set a trial date. The parties are directed before the status hearing to discuss whether this case can be settled and whether a settlement conference with the designated magistrate judge would beneficial to that end.

Date: April 26, 2017

_____
U.S. District Judge Joan H. Lefkow